Harriette TABAS, Plaintiff,

v.

Robert E. MULLANE, et al.,
Defendants.

Eli BALLAN and Harry
Lewis, Plaintiffs,

v.

Robert E. MULLANE, et al.,
Defendants.

Isabel HEFFLER, Plaintiff,

v.

William T. O'DONNELL, Sr., et
al., Defendants.

Civ. A. Nos. 84–309, 84–406 and 84–776.

United States District Court,
D. New Jersey.

Jan. 10, 1985.

Philip S. Fuoco, Haddonfield, N.J., and Stuart H. Savett, Barbara A. Podell, Kohn, Savett, Marion & Graf, P.C., Philadelphia, Pa., and Sherrie R. Savett, Stephen A. Whinston, Berger & Montague, P.C., Philadelphia, Pa., and Stanley Nemser, I. Stephen Rabin, Patricia I. Avery, Wolf Popper Ross Wolf & Jones, New York City, for plaintiffs.

H. Curtis Meanor, Lowenstein, Sandler, Brochin, Kohl, Fisher, Boylan & Meanor, Roseland, N.J., and William D. Heinz, Jenner & Block, Chicago, Ill., for defendant William T. O'Donnell, Sr.

John E. Martindale, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, for defendant Bally Mfg. Corp.

Clive S. Cummis, Sills Beck Cummis Zuckerman Radin & Tischman, P.A., Newark, N.J., for defendants Bally Mfg. Corp. and Directors of Bally Mfg. Corp.

Randy Herndon, Steven J. Rothschild, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for Directors of Bally Mfg. Corp.

## OPINION

BROTMAN, District Judge.

Plaintiffs bring this derivative action under the court's diversity jurisdiction, 28 U.S.C. § 1332. Defendants move to dismiss plaintiffs' petition for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants also move, in the alternative, to stay this proceeding pending the disposition of a similar action in the Delaware Chancery Court. The court heard oral argument on these motions on November 16, 1984. Having considered the submissions and arguments of the parties, and for the reasons provided below, this court will deny defendants' motion for a stay and grant and deny, in part, defendants' motion to dismiss.

**Procedural History**

This is a consolidated derivative complaint. Plaintiffs Harriette Tabas, on January 11, 1984, Eli Ballan and Harry Lewis, on January 31, 1984, and Isabel Heffler, on February 29, 1984, filed derivative actions against nominal defendant Bally Manufacturing Corporation ("Bally") and defendants William T. O'Donnell, Sr., Robert E. Mullane, Walter Wechsler, James M. Rochford, James R. Cowan, George N. Aronoff, and Patrick L. O'Malley, Officers and/or Directors of Bally. On August 10, 1984, plaintiffs filed a consolidated derivative action complaint against Bally, O'Donnell, and the named director defendants.

In summary, plaintiffs allege that defendants breached their fiduciary duty to Bally and its shareholders and wasted the corporation's assets by embarking on a scheme to enrich O'Donnell. The three principal elements of this scheme are alleged to include:

(1) On January 6, 1984, the director defendants caused Bally to purchase O'Donnell's Bally stock at $25 per share, for $17.3 million, a premium of approximately 20 percent above the market price and also to purchase his Bally's Park Place stock at $15 per share, which had a market price of 13½ and 14⅛. Bally's directors approved this plan despite the fact that O'Donnell had previously agreed to divest his stock.

(2) In 1979, Bally extended O'Donnell's employment for five years and raised his salary, effective January 1, 1980, despite the fact that O'Donnell was under investigation by the Division of Gaming Enforcement of the New Jersey Casino Control Commission ("Commission"). In December 1979, O'Donnell resigned all positions with Bally. In 1981, Bally paid O'Donnell $2,112,000 in settlement of all purported claims he might have made pursuant to his employment contract. Plaintiffs argue that Bally should not have paid O'Donnell,

because he breached the agreement by failing to perform the contracted services.

(3) In July 1983, Bally paid $1.9 million to a partnership in which O'Donnell had a two-sevenths interest, for the purchase of the premises at which its former headquarters were located, as well as an additional $292,000 as a lease termination charge. Plaintiffs allege that Bally received no consideration for this additional lease termination payment because it had already purchased the building and the payment exceeded the annual rent.

Plaintiffs also filed derivative suits in the Delaware Chancery Court in January and February 1984 and consolidated their Delaware complaint on August 7, 1984. Shareholders have also filed similar actions against defendants in the United States District Court for the Northern District of Illinois.

Defendants move to dismiss these complaints pursuant to Fed.R.Civ.P. 23.1 for plaintiffs' failure to make demand prior to bringing this derivative action. Plaintiffs argue that defendants are neither disinterested nor independent and their actions are so egregious as to strip them of protection under the business judgment rule and render demand futile. Defendants further move to stay this proceeding pending resolution of defendants' motion to dismiss in the Delaware court.

## I. Motion to Stay This Proceeding

Defendants argue that the court should stay this action because the consolidated complaint duplicates one previously filed in Delaware, involves the same attorneys, seeks identical relief and requires the determination of Delaware law. For a discussion as to the legal standards for granting a stay in deference to ongoing state proceedings, we turn to the Supreme Court's analysis in *Will v. Calvert Fire Insurance Co.*, 437 U.S. 655, 98 S.Ct. 2552, 57 L.Ed.2d 504 (1978).

■ It is well established that "the pendency of an action in state court is no bar to proceedings concerning the same matter in the Federal Court having jurisdiction." *Will, supra* at 662, 98 S.Ct. at 2557, *quoting McClellan v. Carland*, 217 U.S. 268, 282, 30 S.Ct. 501, 505, 54 L.Ed. 762 (1910). There is no question that the court has jurisdiction over this matter pursuant to its diversity power. *See* 28 U.S.C. § 1332. It is equally well settled that a district court is "under no compulsion to exercise that jurisdiction" where a controversy may be settled more expeditiously in state court. *Id.* 437 U.S. at 662–63, 98 S.Ct. at 2557, *quoting Brillhart v. Excess Insurance Co.*, 316 U.S. 491, 494, 62 S.Ct. 1173, 1175, 86 L.Ed. 1620 (1942).

■ The decision as to whether to defer to the state court is "largely committed to the 'carefully considered judgment' of the district court." *Id.* 437 U.S. at 663, 98 S.Ct. at 2557. The Supreme Court noted that:

> [o]rdinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in state court and presenting the same issues, not governed by federal law, between the same parties. Gratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided.

*Id.* at 663–64, 98 S.Ct. at 2558, *quoting Brillhart, supra* 316 U.S. at 495, 62 S.Ct. at 1175. It is true, as plaintiff argues, that the Supreme Court emphasized in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Id.* at 817, 96 S.Ct. at 1246. The court noted that the language

> underscores our conviction that a district court should exercise its discretion with this factor in mind, but in no way undermines the conclusion of *Brillhart* that the decision whether to defer to the concurrent jurisdiction of a state court is, in the last analysis, a matter committed to the district court's discretion.

*Will, supra,* 437 U.S. at 664, 98 S.Ct. at 2558. As Justice Cardozo has held,

> [t]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.

*Landis v. North American Company,* 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1936).

■ Factors which the court should consider and balance in determining whether to stay an action include:

(1) ease of access to sources of proof

(2) availability of compulsory process for attendance of hostile witnesses

(3) the possibility of viewing premises, if appropriate

(4) the enforceability of any judgment rendered

(5) the efficiency of the litigation

(6) the progress of the litigation already commenced in state court, and

(7) the applicability of state and/or federal law.

*Gilbane Building Company v. Nemours Foundation,* 568 F.Supp. 1085 (D.Del. 1983); *ABCKO Music, Inc. v. Beverly Glen Music, Inc.,* 554 F.Supp. 410 (S.D.N.Y.1983); *National Bank of Detroit v. United States,* 1 Cl.Ct. 712 (Cl.Ct.1983). However, the moving party has the burden to demonstrate sufficient grounds to warrant a stay. *Gilbane, supra; Kraftsman Container Corp. v. Finkelstein,* 461 F.Supp. 245 (S.D.N.Y.1978).

The possibility of multiple suits is greater in the derivative action context than it is in most other types of litigation. *See Amdur v. Lizars,* 372 F.2d 103 (4th Cir.1967); *Klein v. Walston & Co.,* 432 F.2d 936, 937 (2nd Cir.1970). To avoid overburdening defendant corporations, district courts have granted stays only in deference to a previously commenced state court action which can adjudicate the rights of all parties concerned. *See Amdur, supra.* In *Amdur,* the Fourth Circuit found a stay warranted

where plaintiffs commenced a state action fully ten months prior to the federal suit. The court further found that plaintiffs had aggressively litigated the state action to a point where it was "appreciably more advanced" than the federal action. The parties had conducted numerous hearings, solicited and secured documentation and filed an answer on the merits. The court stressed that by granting a stay under these circumstances, it prevented any undue:

> inconvenience, loss of time, and expense inflicted upon the corporate defendant, and the danger that its treasury may be depleted by litigation supposedly prosecuted for its benefit.

*Amdur, supra* at 107; *Ferguson v. Tabah,* 288 F.2d 665 (2nd Cir.1961); *Mottolese v. Kaufman,* 176 F.2d 301 (2nd Cir.1949). Despite these policy concerns, the Fourth Circuit still suggested that "should plaintiffs prefer to proceed in federal forum, the District Court may lift its stay order...." *Amdur, supra* at 108.

■ The circumstances in this case do not warrant a stay based on the grounds articulated above. First, no previously filed, significantly litigated, or more advanced state action exists. Plaintiffs filed both their federal and state actions during roughly the same period of time—January and February 1984. They consolidated their state and federal actions during the same week in August 1984. The defendants' motion to dismiss—decided by this court today—has yet to be heard in the state court.

Defendants have failed to provide this court with any evidence that the state court will be able to adjudicate the rights of all the parties to this action. They merely attach a copy of plaintiffs' state court brief to their own. This brief, however, addresses only the motion to dismiss for failure to make demand and not the ultimate relief sought by the parties. Plaintiffs raise unrebutted allegations that the Delaware court may not be able to adjudi-

cate the rights of defendant O'Donnell, due to lack of *in personam* jurisdiction.

An order for expedited discovery has been entered in the state court proceeding. However, only the depositions of defendants Mullane, Aronoff and O'Donnell have been taken. Both parties have entered a stipulation that they can use these depositions in both the federal and state actions. One court has found the presence of such an agreement sufficient to deny a stay in a shareholder derivative action. *Kaufman v. Jeffords*, 268 F.Supp. 784 (S.D.N.Y.1967). Defendants make no showing that further prosecution of the federal action will deny them access to sources of proof, hostile witnesses, or any judgments rendered in the future. The court finds, therefore, that defendants offer no evidence that a stay of the federal action will promote the efficient handling of this litigation.

Finally, the court rejects defendants' arguments that it should defer to the Delaware court for consideration of novel issues of state law. The issues arising in this complaint have been subject to repeated, extensive and thorough analysis by the Delaware courts, most recently in the cases of *Aronson v. Lewis*, 473 A.2d 805 (Del.Supr.1984) and *Pogostin v. Rice*, 480 A.2d 619 (Del.Supr.1984). The United States Supreme Court has held that:

> the difficulties of ascertaining what the state courts may hereafter determine the state law to be do not in themselves afford a sufficient ground for a federal court to decline to exercise its jurisdiction to decide a case which is properly brought to it for decision.

*Meredith v. City of Winter Haven*, 320 U.S. 228, 235, 64 S.Ct. 7, 11, 88 L.Ed. 9 (1943).

The court finds that defendants have failed to meet their burden to justify the imposition of a stay and therefore, the court will deny their motion.

## II. Motion to Dismiss

The director defendants have moved under Federal Rule of Civil Procedure 12(b)(6) for an order dismissing this action on the ground that plaintiffs failed to make demand on Bally's Board of Directors or alleged particularized facts demonstrating demand futility as required by Federal Rule of Civil Procedure 23.1.

### A. The Standard for Demand Futility

■ Plaintiffs argue that they are excused from making demand upon Bally's directors because of its futility. State law determines whether plaintiffs are excused from the demand requirement. *Lewis v. Curtis*, 671 F.2d 779, 785 (3rd Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to its shareholders, in the absence of another state with a more significant relationship. Bally is a Delaware corporation. Both parties argue Delaware law should apply. The court finds that no other state has a more significant relationship to the parties and the transaction, and therefore, the court must apply Delaware law. *See* Restatement (Second) Conflicts of Laws § 309.

The Supreme Court of Delaware has held that "[a] cardinal precept of the General Corporation Law of the State of Delaware is that its directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del.Supr.1984). The Delaware statute provides that:

> The business and affairs of a corporation organized under this chapter shall be managed by or under the direction of a board of directors except as may be otherwise provided in this Chapter or in its certificate of incorporation.

8 Del.C. § 141(a). *See Aronson, supra* at 811.

Federal Rule of Civil Procedure 23.1, which is similar to Delaware Chancery Rule 23.1, provides that:

> In a derivative action brought by one or more shareholders or members to enforce a right of a corporation ... *[t]he complaint shall ... allege with particu-*

*larity* the efforts, if any, made by the plaintiff to obtain the action he desires from the directors of comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort.

Fed.R.Civ.P. 23.1 (emphasis added). This demand function is consistent with the principles of Delaware corporate law and ensures that shareholders exhaust intracorporate remedies as a prerequisite to instituting a derivative action. In this manner, the corporation has an opportunity to correct the wrong and avoid suit or to bring and control litigation otherwise brought in its behalf.

The Supreme Court of Delaware recently reviewed state law in this area and articulated a revised standard for evaluating the futility of making a demand on the Board of Directors. *See generally Aronson, supra.* The test demonstrates that the question of demand futility is inextricably bound to the issues of business judgment and the standards of that doctrine's applicability. *Id.* at 812; *Pogostin v. Rice,* 480 A.2d 619 (Del.Supr.1984). The business judgment rule is an "acknowledgement of the managerial prerogatives of Delaware directors under § 141(a)" and presumes that in making a decision, the directors "acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Aronson, supra* at 812. The test requires a bifurcated analysis. To excuse demand, the court:

must decide whether, under the particularized facts alleged, a *reasonable doubt* is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise a product of a valid exercise of business judgment. Hence, the [court] must make two inquiries, one into the independence and disinterestedness of the directors and the other into the substantive nature of the challenged transaction and the board's approval thereof.

*Id.* at 814–15 (emphasis added). If the court, in the exercise of its sound discretion, "is satisfied that a plaintiff has alleged facts with particularity which, taken as true, support a reasonable doubt as to either aspect of the *Aronson* analysis, the futility of demand is established and the court's inquiry ends." *Pogostin, supra* at 624.

The questions of disinterestedness and independence of directors:

are measured in relation to certain fundamental principles. Directorial interest exists whenever divided loyalties are present, or a director has either received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders. The question of independence flows from an analysis of the factual allegations pertaining to the influences upon the directors' performance of their duties generally, and more specifically in respect to the challenged transaction. The second, or business judgment inquiry of *Aronson,* focuses on the substantive nature of the challenged transaction and the board's approval thereof. A court does not assume that the transaction was a wrong to the corporation requiring corrective measures by the Board. Rather, the transaction is reviewed against the factual background of the complaint to determine whether a reasonable doubt exists at the threshold that the challenged action was a valid exercise of business judgment.

*Id.*

In adopting the "reasonable doubt" test, *Aronson* specifically rejected the "reasonable inference" test previously employed by the Delaware courts in order to avoid the situation in which "demand futility becomes virtually automatic." *Aronson, supra* at 814. The inference must be so compelling as to create a reasonable doubt. *Id.; Kaufman v. Belmont,* 479 A.2d 282, 289 (Del.Ch.1984). The demand requirement, therefore, cannot be lightly disregarded and the plaintiffs must consider the consequences if they choose to avoid

seeking redress through the corporation. *Kaufman, supra* at 286. The burden is on the plaintiff to show that the requirements of the rule have been satisfied. *Kaufman v. Beal*, Civ.Act. Nos. 6485, 6526 (Del.Ch. Feb. 25, 1983) slip op. at 4. *See Lewis v. Curtis, supra; In re Kauffman Mutual Fund Actions*, 479 F.2d 257 (1st Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973). Stricter pleading requirements are imposed than the usual requirement that the allegations of the complaint must only give fair notice of a claim. *Kaufman v. Beal, supra* at 5. For the purposes of deciding whether plaintiffs meet the requirements of this test, the court may consider only the allegations contained in the plaintiffs' consolidated action. All well pled facts are assumed to be true. *Pogostin, supra* at 622; *Aronson, supra* at 815; *Lewis v. Hutt*, No. 6752 (Del.Ch. Sept. 4, 1984) slip op. at 9–10.

■ Board decisions carry a strong presumption of good faith and validity. Only where officers and directors are under an influence which sterilizes their discretion can they be considered improper persons to conduct litigation on behalf of the corporation. Only then would demand be futile. *Aronson, supra* at 814.

■ The plaintiffs must allege facts with particularity regarding such interest and control. The good faith presumption can only be rebutted by alleging "such facts as would demonstrate through personal or other relationships" that a majority of the directors are beholden to the controlling person. *Id.* at 815; *Kaufman v. Beal, supra* at 11. At minimum, the plaintiff must show "some sort of bad faith" by the directors. *Johnson v. Trueblood*, 629 F.2d 287, 292 (3rd Cir.1980), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). *See Pogostin, supra* at 625 (need to show "actual fraud").

■ Mere allegations of directorial approval of a transaction, "absent particularized facts supporting a breach of fiduciary duty claim, or otherwise establishing the lack of independence or disinterested-ness of a majority of the directors, is insufficient to excuse demand." *Aronson, supra* at 817. Allegations regarding a director's interest in typical board perquisites, prestige, or a motive to retain control, without more, does not constitute bad faith, unless the court chooses to ignore the realities of modern corporate life. *Johnson, supra; Panter v. Marshall Field & Co.*, 646 F.2d 271, 294 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) (Normal duties of a director and payment of normal director's fees insufficient to show interest or lack of independence). To hold otherwise would taint every transaction approved by a board.

■ The court rejects plaintiffs' argument that directors have an improper interest in the alleged transactions because they would have to initiate suit against themselves. The law is clear that this "bootstrap argument" must fail and "raises no legally cognizable issue under Delaware corporate law." *Aronson, supra* at 818.

The court now turns to its evaluation of each specific transaction.

### 1. The Stock Purchase

The Delaware General Corporate Law confers broad discretion upon directors in the issuance of stock options and rights and authorizes a corporation to purchase its own stock. *See* 8 Del.C. § 160(a). Mere approval of the stock agreement does not support a claim for lack of independence under Delaware law or strip the presumption of good faith and independence from the directors. *Aronson, supra* at 815.

The court has constructed the following factual chronology regarding the stock transaction from plaintiffs' pleadings:

1. Defendant O'Donnell entered into an employment contract to serve as the President of Bally effective January 1, 1976. Consolidated Complaint at ¶ 38. Between January 1, 1976 and December 16, 1979 O'Donnell became and/or served as Chairman of the Board of Bally, in addition to its President. *Id.* at ¶ 6.

2. On December 5, 1979, O'Donnell entered into an agreement with an unnamed party, allegedly in connection with the issuance of a temporary casino permit to Bally's Park Place, a subsidiary of Bally's, to resign as an officer and director of Bally and its subsidiaries and enter into an irrevocable trust agreement with respect to his shares of Bally common stock. *Id.* at ¶¶ 19, 20.

3. On December 29, 1980, the Casino Control Commission denied O'Donnell a license and required the continuation of the trust pending the divestiture of his Bally and Bally's Park Place stock. *Id.* at ¶ 23. O'Donnell unsuccessfully appealed this ruling. *Id.* at ¶ 24.

4. O'Donnell placed his Bally and Bally's Park Place stock in a trust on September 20, 1983, pursuant to a divestiture plan approved by the Casino Control Commission. *Id.* at ¶ 23.

5. In November 1983, the Casino Control Commission learned O'Donnell had pledged his Bally stock as collateral, *inter alia,* for a loan. *Id.* at ¶ 26.

6. O'Donnell caused the release of his Bally stock from the pledge and entered into a trust agreement for divestiture dated December 15, 1983. *Id.* at ¶ 26.

7. On January 6, 1984, Bally agreed to purchase 690,000 shares of its common stock held by O'Donnell at $25 per share, for $17.9 million, a premium of approximately 20% over market price. Bally agreed to bear the cost of O'Donnell's defense to any legal actions resulting from this buy-out. *Id.* at ¶ 28.

8. Bally purchased the 43,803 shares of Bally's Park Place stock owned by O'Donnell at $15 per share, exceeding the closing prices of the stock on January 5 and 6, 1984, which were 13½ and 14⅛ respectively. Bally purchased these shares because the by-laws of Bally's Park Place prevented Bally's Park Place from repurchasing its own shares for a price higher than the market price. *Id.* at ¶ 37.

The plaintiffs fail to show any "causal link" between O'Donnell's alleged control over Bally's directors and the approval of the stock transaction. *See Aronson, supra* at 816. Although O'Donnell had served as Chairman of the Board and President of Bally, he resigned on December 16, 1979, and subsequently placed his stock in a trust. The alleged wrongful acts by director defendants all occurred after that date.

The Delaware Supreme Court has held that in the demand context, "[s]tock ownership alone, at least when it amounts to less than a majority interest, is not sufficient proof of domination or control." *Aronson, supra* at 815. *Kaplan v. Centex Corp.,* 284 A.2d 119 (Del.Ch.1971). *Aronson* held that a shareholder who owned a 47 percent interest in the company *and* had elected most of the members of the Board of Directors did not exercise the control needed to enable the court to excuse demand in a derivative suit. *Id.* It is also insufficient to charge that the directors were nominated and elected at the behest of those controlling. *Id.* at 816. Plaintiffs allege no particular facts which suggest that O'Donnell controlled a majority of the Board, either from a position of management, membership on the Board itself, or as an owner of stock, the traditional incidences of control.

Plaintiffs also allege that O'Donnell's son held the positions of Vice President of Bally and President of Aladdin's Castle, Inc., a Bally subsidiary and that his son-in-law served as Vice President, Secretary and General Counsel to Bally. Consolidated Complaint at ¶ 52(b). However, "the mere serving...as an officer of a corporation [does not] demonstrate control or domination." *Kaufman v. Beal, supra* at 11. The court also finds that statements by defendants praising O'Donnell and his services are insufficient to raise a reasonable doubt as to their loyalty to the company. Consolidated Complaint at ¶ 52(a).

Plaintiffs allege that defendant directors have an interest in this matter because the company indemnified and financed O'Donnell's legal efforts to reverse the Casino Control Commission's opinion, Consolidated Complaint at ¶ 25, and agreed to indemnify

O'Donnell in any action challenging the buy-back of his shares. *Id.* at ¶ 29. These facts are insufficient to excuse demand.

The Delaware Corporate Law specifically authorizes corporations to indemnify present and former directors and officers. 8 Del.C. § 145. Board members have no personal interest arising from these obligations. The corporation merely has an obligation to pay the legal bills. Plaintiffs do not allege that Bally agreed to conduct O'Donnell's defense.

Plaintiffs also claim that defendant Aronoff has an interest. Bally paid the law firm of Benesch, Friedlander, Coplan & Aronoff, of which Aronoff is a name partner, legal fees of $1,450,000 in 1979, $896,000 in 1980, more than $1,000,000 in 1982 and approximately $1,300,000 in 1983. Aronoff has a longstanding business relationship with O'Donnell and is a member of the Compensation and Stock Options Committee. Consolidated Complaint at ¶ 11. However, plaintiffs do not allege that Aronoff acted improperly at any time or that the firm failed to provide the services warranting these fees. Without more, these allegations are insufficient to overcome the presumption of validity provided to the actions of directors.

Plaintiffs argue that under the stock buy-out agreement, the directors decided that any action brought to challenge the transaction would be "spurious and without merit," and thus prejudiced any shareholder demand petition. *Id.* at ¶ 53. The court finds this objection to be without merit. It constitutes mere precatory language on the part of the directors, and only suggests their reasoned assent to the transaction. For the directors to decide otherwise could leave them vulnerable to attack on business judgment grounds.

Plaintiffs do raise sufficient particular allegations as to the director's lack of "care, attention, and sense of individual responsibility" in the performance of their duties to create a reasonable doubt as to their independence and overcome the presumptions of the business judgment rule. *Aronson, supra* at 816. *See Lewis v.*

*Hutt, supra* at 10. Under the business judgment rule, director liability is predicated upon wrongs equal to or exceeding gross negligence. *Aronson, supra* at 812. Plaintiffs allege that the defendant directors knowingly and needlessly wasted the corporation's assets and call into question their due care. *Gimbel v. Signal Cos., Inc.,* 316 A.2d 599 (Del.Ch.1974), *aff'd per curiam,* 316 A.2d 619 (Del.Supr.1974). Such lack of due care may expose board members to potential liability. *Kaufman, supra* at 14.

The plaintiffs further allege that Bally did not have to purchase O'Donnell's stock, at a premium or otherwise, as he was required to divest it pursuant to an order from the New Jersey Casino Control Commission. Failure to divest his interest in Bally's would subject him to potential civil and criminal liability. Consolidated Complaint at ¶ 33. Therefore, Bally's decision to buy out his shares at a premium of 20 percent above the market price grossly wasted corporate assets. Plaintiffs contend that Bally had a market for its shares sufficient to accommodate the divestiture and that 35 million shares of Bally common stock traded on the open market last year. *Id.* at ¶ 5. Plaintiffs also allege that Bally's directors forced Bally to buy back O'Donnell's Bally's Park Place shares, in order to circumvent a by-law which prevented Bally's Park Place from purchasing its own shares above market price, and thus further wasted Bally's corporate assets. *Id.* at ¶ 37.

Plaintiffs plead that the New Jersey Casino Control Commission stated that Bally "did not have to purchase" O'Donnell's stock, and that the buy-out was "not necessary to effect the divestiture of the O'Donnell shares." The Commission reported that the manner in which the buy-back agreement was reached was "troubling" and cause of "some concern." *Id.* at ¶ 32. The plaintiffs further allege that the directors did not act on an informed basis and approved the transaction "partly absent any meaningful negotiations" as a "hastily called telephonic meeting." The

directors were not informed about the purpose of the meeting in advance. *Id.* at ¶ 54(ii). Plaintiffs offer particularized facts that the transaction came at a time of significant decline in income, stock price, and profitability for Bally. *Id.* at ¶¶ 35, 36.

 The court finds that the plaintiffs' allegations, considered together, raise a reasonable doubt as to the directors' independence and business judgment. Therefore, the court denies defendants' motion to dismiss for failure to make demand as to the stock purchases.

### 2. The Employment Contract

 Delaware Law provides that "[e]very corporation created under this Chapter shall have the power to appoint such officers and agents as the business of the corporation requires and to pay or otherwise provide to them suitable compensation." 8 Del.C. 122(5). Directors carry a good faith presumption in their establishment of employment relationships. *Kaufman v. Beal, supra* at 15. As a result, courts are reluctant to inquire into the reasonableness of executive compensation, especially if it is fixed by a disinterested board of directors. *Wilderman v. Wilderman,* 315 A.2d 610, 615 (Del.Ch.1974).

Plaintiffs plead that the defendant directors acted improperly in both the making and the termination of the employment agreement between Bally and O'Donnell. The court has constructed the following factual chronology from plaintiffs' pleadings.

1. Defendant O'Donnell entered into an employment contract to serve as the President of Bally effective January 1, 1976. Consolidated Complaint at ¶ 38. Between January 1, 1976 and December 16, 1979, O'Donnell became and/or served as Chairman of the Board of Bally, in addition to its President. *Id.* at ¶ 6.

2. The Board of Directors increased O'Donnell's salary to $275,000 per year, effective January 1, 1978. *Id.*

3. On January 25, 1978, Bally applied to the Casino Control Commission for a casino license. On February 24, 1978, Bally's Park Place, a subsidiary of Bally's, applied for a casino license. *Id.* at ¶ 16.

4. As a result of these applications, the Division of Gaming Enforcement began an investigation into the qualifications of the companies and their officers and directors, including O'Donnell. *Id.* at ¶ 18.

5. In November 1979, the Board of Directors increased O'Donnell's salary to $350,000, effective January 1, 1980, "with discretionary bonuses and other employment benefits." *Id.* at ¶¶ 38, 40. This agreement extended his term of employment for five years, the longest such extension to date. *Id.*

6. On December 5, 1979, O'Donnell entered into an agreement with an unnamed party, allegedly in connection with the issuance of the temporary casino permit to Bally's Park Place, to resign as an officer and director of Bally and its subsidiaries and enter into an irrevocable trust agreement with respect to his Bally shares of common stock. *Id.* at ¶ 20.

7. Pursuant to the December 5, 1979 agreement, O'Donnell resigned all positions held by him with Bally and its subsidiaries on December 16, 1979. *Id.* at ¶ 38.

8. On August 20, 1980, the Division of Gaming Enforcement filed a report and Statement of Issues, recommending, in part, that the Casino Control Commission deny a license to O'Donnell. *Id.* at ¶¶ 22, 23.

9. Following a full hearing, the Casino Control Commission issued an opinion on December 29, 1980 denying O'Donnell a license. Plaintiffs allege that "[c]onsequently" the Commission "foreclosed defendant O'Donnell from playing any role in the management or in the formulation of policy of Bally and Bally's Park Place...." *Id.* at ¶ 23.

10. In February 1981, Bally and O'Donnell entered into an agreement whereby Bally paid defendant O'Donnell $2,112,000 as settlement of any claims with respect to termination of the employment agreement. *Id.* at ¶ 40.

Plaintiffs allege that defendants violated their fiduciary duty to the company and wasted Bally's assets by (1) approving a new contract between O'Donnell and Bally when it knew O'Donnell was being investigated, and (2) buying out the employment agreement even though O'Donnell was prohibited from performing services for Bally and its subsidiaries.

First, plaintiffs fail to allege any particular facts which indicate that the defendant directors had an interest in or failed to exercise judgment independently with regard to either the approval of the extension of employment or the termination of the contract. Plaintiffs' allegations fail to go beyond mere conclusory statements that Bally paid O'Donnell more than arguably due him and that he failed to perform his contracted services. *See Aronson, supra* at 817.

Plaintiffs allege that directors should have refrained from extending O'Donnell's contract, given the investigation by the Division of Gaming Enforcement. However, the Division did not make an adverse recommendation regarding O'Donnell of any kind until August 12, 1980, fully eight months after the directors extended his contract. Plaintiffs further fail to allege that the investigation was more than routine, as a result of Bally's Park Place's application for licensure, or that it pertained to only O'Donnell. Plaintiffs fail to allege that the directors knew or should have known that the Division was investigating any particular acts of wrongdoing. Plaintiffs fail to allege that the corporate directors extended his contract and raised his salary after his "agreement" of December 5, 1979 to resign and place his stock in trust. In fact, plaintiffs do not even identify the parties to the agreement. Plaintiffs only infer that the issuance of Bally's Park Place's temporary casino permit led to O'Donnell's resignation.

Plaintiffs do note that O'Donnell served as both Chairman of the Board and President of Bally until his resignation. Consolidated Complaint at ¶ 6. His duties as Chairman extended far beyond his interest in Bally's Park Place, one of the company areas of concern. They note that defendant Mullane, in a letter to shareholders included in Bally's 1980 Annual Report, praised O'Donnell as "the man most responsible for the success of Bally's over the years." He referred to Bally and its subsidiaries as "companies which Mr. O'Donnell formed and personally guided from their inception." The letter stated management's collective "great sorrow about the decision [of the Commission] affecting Bill O'Donnell." *Id.* at ¶ 52(a). Given this glowing evaluation of O'Donnell's performance, it is not surprising that the Board voted him a salary increase. As to the timing of the increase, plaintiffs allege that O'Donnell received only one other raise, effective January 1, 1978, two years after the commencement of his contract. His second and contested raise follows this initial increase by another two year period. The court cannot find that, as Chairman and President of Bally, O'Donnell received unreasonable or untimely compensation.

Plaintiffs argue that as a result of the Casino Control Commission's denial of O'Donnell's license, he could not perform services for Bally under his contract. However, they fail to allege that the Commission had the power to terminate and did so terminate the contract between Bally and O'Donnell, thereby making it impossible for O'Donnell to render those services. The court cannot infer that the "agreement" of December 5, 1979 which led to O'Donnell's resignation, voided the employment agreement. The complaint highlights Bally's dilemma following the Commission's refusal to grant O'Donnell's license. Bally could either choose to maintain its longstanding and profitable relationship with O'Donnell—at great peril to its own Atlantic City casino licenses—or it could terminate its relationship with O'Donnell and maintain its lucrative business in the state. Bally chose to retain its Atlantic City Casino and sever ties to O'Donnell, and implemented its decision by buying out the remaining interest in O'Donnell's contract.

■ The court does not find the inferences which can be drawn from the pleadings sufficiently compelling to create a reasonable doubt as to defendants' business judgment in approving the agreements, as required by *Aronson*. Plaintiffs having failed to make demand upon the corporation, the court dismisses their claims against the director defendants arising out of the employment agreements.

### 3. The Land Purchase and Lease Termination

■ The Delaware law authorizes corporations to purchase and lease real property. Such board-approved transactions carry a presumption of propriety. *Tabas v. Crosby*, Civ.Act. No. 6619 (Del.Ch. July 23, 1982), *aff'd sub nom. Geller v. Tabas*, 462 A.2d 1078 (Del.Supr.1983).

Plaintiffs allege that for several years, Bally maintained a corporate headquarters at 2640 Belmont Avenue, Chicago, Illinois, and paid an annual rent of $219,000. Bally rented the office space from a partnership in which O'Donnell owned a two-sevenths interest under a lease "that extended through 1983." In 1983, Bally moved its corporate headquarters to 8700 Bryn Mawr Avenue. In July 1983, the directors "then in office" caused Bally to purchase the 2640 Belmont Avenue premises for $1.9 million. The directors further caused Bally to pay a lease termination charge of $292,-000. Consolidated Complaint at ¶ 41. Plaintiffs call these payments excessive and a waste of corporate assets.

■ Plaintiffs fail to offer any particularized facts regarding the impropriety of this transaction beyond the mere conclusory allegations of "excessive costs." Such conclusory allegations were flatly rejected as insufficient in *Aronson*. *See Aronson, supra* at 816–18. In the demand-futile context, a plaintiff charging domination and control of one or more of the directors must allege particularized facts manifesting "a direction of corporate conduct in such a way as to comport with the wishes or interests of the [person] doing the controlling." *Id.* at 816, *quoting Kaplan, supra* at 123. Plaintiffs offer no facts which address their general allegations as to the interest and/or lack of independence of the directors.

Importantly, plaintiffs do not argue that the leasehold interest was bargained for separately. The court construes the pleading to state that the parties bargained for an aggregate purchase price of $2,192,000, apportioned between the purchase price and the leasehold interest. Further, plaintiffs do not include any allegations as to when the lease terminated—a fact necessary to evaluate the consideration paid to the leasehold interest. Plaintiffs ask the court to infer that the lease would have terminated six months after the July 1983 purchase date because the lease "extended" through 1983, and therefore, a lease termination charge of $292,000 would be excessive on its face, given the annual rental fee of $219,000. The court emphasizes that this is the type of inference rejected in *Aronson*, in deference to the stated public policy behind the demand provisions. *See Aronson, supra* at 811. Plaintiffs must plead facts with particularity to overcome the presumption in favor of the validity of the transaction. Here plaintiffs omit any allegations as to when the lease terminated. The fact that the lease "extended" through 1983 provides no clear information as to its expiration, and is thus, insufficient.

■ Plaintiffs argue in their briefs that they "suspect" that the consideration for the interest in the property was excessive and "will be the subject of prompt discovery." *See* Plaintiffs' Brief, September 26, 1984, at p. 24. However, "[i]n the Rule 23.1 context, only the pleadings are considered and the plaintiff is not entitled to supplement his allegation of demand futility." *Kaufman, supra* at 15. The court cannot conclude, under *Aronson*, that the facts, as alleged, create the reasonable doubt needed to waive the demand require-

ment. Therefore, the court grants defendants' motion to dismiss for failure to make demand as to the land purchase and lease termination.

### 4. Scheme to Enrich O'Donnell

■ Plaintiffs allege that the above transactions, taken together, constitute a scheme—"a continuous course of conduct and business to unlawfully and improperly enrich defendant O'Donnell and to circumvent the directives of the Casino Control Commission." Consolidated Complaint at ¶ 15. It is true that each of these transactions involve O'Donnell. However, plaintiffs fail to offer facts that the same directors approved the transactions, and even if they did, that the directors were not disinterested or independent.

Bally had a reasonable business purpose, as articulated by plaintiffs, in extinguishing its business connections with O'Donnell. Failure to eliminate its relationship with O'Donnell could have jeopardized its license to do business in Atlantic City. *See, e.g.,* Consolidated Complaint at ¶¶ 20, 23, 25, 26 and 34. The pleading demonstrates that Bally severed its ties to O'Donnell methodically, over a period of nearly five years, and kept its casino license as a consequence.

The court has thoroughly considered the plaintiffs' allegations as a group and finds that they do not create the reasonable doubt needed to excuse demand.

An appropriate order will be entered.