Abraham KAPLAN, Administrator, C. T. A.
of the Estate of Nat Gluck, de-
ceased, Plaintiff,

v.

CENTEX CORPORATION et al.,
Defendants.

Court of Chancery of Delaware,
New Castle.

May 21, 1971.

On Reargument Oct. 22, 1971.

Irving Morris, of Cohen, Morris & Rosenthal, Wilmington; and Sidney B. Silverman, New York City, for plaintiff.

Richard F. Corroon, of Potter Anderson & Corroon, Wilmington, Walter M. Spradley, of Jenkens, Spradley & Gilchrist, Dallas, Tex., for Centex Corporation.

George Tyler Coulson, of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendants Heftler Construction Co., Herbert Heftler and Trammell Crow.

Henry M. Canby and Richard F. Balotti, of Richards, Layton & Finger, Wilmington, for certain defendants.

Arthur F. DiSabatino and Andrew G. T. Moore, II, of Killoran & Van Brunt, Wilmington, for defendant Lomas & Nettleton Financial Corporation.

DUFFY, Chancellor:

This is a derivative action by a stockholder of Lomas & Nettleton Financial Corporation (L. & N.) for its benefit. Defendants are two corporations with which L. & N. was involved in joint ventures, Centex Corporation (Centex) and Heftler Construction Company (Heftler), and various individuals with an interest in one or more of the three corporations. This is the decision after trial on the merits.

### A.

Centex and Heftler are construction companies which invest in and develop large real estate projects. L. & N. is in the business of providing mortgage banking, direct lending and other financing to builders and developers. At the time of the transactions about which plaintiff complains,

Heltler owned 1.4% of L. & N.'s common stock; defendant Herbert Heftler, president and majority shareholder of the Heftler Company, owned 8.02% and Centex owned 10.6% of that stock. The combined holdings thus amounted to about 20% of L. & N.'s shares.

The first cause of action involves joint ventures in land development undertaken by L. & N. with Centex and Heftler in Puerto Rico. Plaintiff contends that L. & N. received nothing or, alternatively, an inadequate consideration when it transferred its equity interests to Heftler and Centex. In the second cause of action, asserted against Centex only, plaintiff contends that L. & N. paid an excessive amount in settlement of a contract obligation involving land development in Texas. All defendants deny these charges.

I first consider the Puerto Rican projects.

### B.

The land in Puerto Rico some 2,500 acres, was owned by four separate entities: three joint ventures and a trust created un-

der an instrument dated August 12, 1963 (the Trust). The joint ventures, which began about 1961, were Sabana, Salinas (sometimes referred to together as "Carolina") and Bayamon. The Trust and each of the ventures were owned 40% by Heftler, 40% by Centex and 20% by L. & N.[1] Centex and Heftler each paid for their respective interests $125,000 in Bayamon, $175,000 in Salinas, and $50,000 in Sabana. They paid nothing for each interest in the Trust. L. & N. provided financing to the ventures and to Centex and Heftler for their purchases in them. It received equity interests because it was the lender in the transactions; in short, the 20% equities were part of the consideration for the financing. The circumstances under which L. & N. parted with these interests are the basis for this first cause of action.

The ventures had financial troubles, there were management problems. And L. & N. had its own financial crisis arising from liquidity requirements. L. & N. became concerned about the size of its Puerto Rican commitment, which by 1964 amounted to some $10,000,000.[2] Both it and Cen-

---

1. Each of the joint ventures held its interest through a wholly owned subsidiary, and the resulting inter-corporate relationship is illustrated by a diagram taken from plaintiff's brief:

[A4502]

---

2. L. & N. had agreed to lend to the ventures a total of $9,000,000, with a $7,500,000 maximum at any time, on the credit of Centex, Heftler and Murchi-

tex were dissatisfied with Heftler's management of the projects. About the end of 1964 reorganization of all of the interests was discussed by the joint venturers. Negotiations were had between Centex and Heftler looking toward a separation of their respective interests. Heftler offered to buy Centex's 40% interest in all three ventures for $2,000,000 (and a release to Centex and its principal stockholders of some $28,000,000 in loans which they had guaranteed). That is a key point of evidence in plaintiff's claim that the interest of L. & N. (20%) was worth $1,000,000. On February 11, 1965 Heftler made an offer of $500,000 to L. & N. for its entire equity interest. That was not accepted. Heftler then offered $575,000 cash and a note for $100,000 payable out of profits. L. & N. was willing to accept that offer but Heftler was unable to obtain the necessary financing to buy the interest of either Centex or L. & N.

Centex and L. & N. then began negotiations looking toward realignment of all interests. Defendants' evidence shows that on July 30, 1965 a tentative agreement was reached under which L. & N. would exchange its 20% interest in Bayamon for an increase from 20% to 25% of its interest in Carolina, annd give Centex an option to purchase its interest in the latter venture for $750,000. That figure was suggested by L. & N.'s president and accepted by Centex. Defendants contend, and their evidence shows, that in the summer of 1965 a basic plan was agreed to by the three principals; it was this:

(a) Heftler would surrender its interest in Carolina; Centex and L. & N. would surrender their respective interests in Bayamon;

(b) Heftler would become the sole equity holder in Bayamon;

(c) Centex would acquire a 75% equity interest in Carolina;

(d) L. & N. would acquire a 25% equity interest in Carolina.[3]
First Boston and The Chase Manhattan Bank provided new financing to make the realignment possible.

During the week of October 15, 1965 the principals, the lenders and counsel met in San Juan, Puerto Rico to close on the reorganization. Essentially, the plan agreed upon was implemented. L. & N. surrendered its interest in Bayamon, it was released from and indemnified against debts of Bayamon, and the demand obligations owed it by Centex, Heftler annd Bayamon were paid.

The Centex-L. & N. relationship at the end of that week in San Juan and what occurred thereafter are significant, but I lay those matters aside and now consider certain of the legal arguments.

### (1)

Plaintiff alleges that Centex and Heftler dominated and controlled L. & N. but in his brief he says only that they had "representatives" on the Board of Directors and therefore should be held to the same standard of care (fiduciary) as directors. He argues indeed that they should be held to a higher standard than other directors because they dealt with L. & N. Centex and Heftler contend that they did not control L. & N. and that plaintiff failed to prove that they did, either singly or in combination with others.

A plaintiff who alleges domination of a board of directors and/or control of its affairs must prove it. Blish v. Thompson Automatic Arms Corporation, 30 Del.Ch. 538, 64 A.2d 581 (1948). Stock

---

son Brothers (a partnership composed of C. W. Murchison, Jr. and John D. Murchison). In January 1964 First National Bank of Boston (First Boston) agreed to a $42,000,000 credit with a $12,000,000 maximum at any time.

3. A contemporary memorandum dated August 6, 1965, states that "They [Centex] prefer to give us [L. & N.] a profit participation agreement rather than a 25% ownership in the stock of the corporations owing [sic] this land."

ownership alone, at least when it amounts to less than a majority, is not sufficient proof of domination or control. Mayer v. Adams, 39 Del.Ch. 496, 167 A.2d 729; aff'd 40 Del.Ch. 94, 174 A.2d 313 (1961). Compare Issner v. Aldrich, 254 F.Supp. 696 (D.Del.1966).

■ "Control" and "domination" are here used in the ordinary meaning of the words and they may be exercised directly or through nominees. But, at minimum, the words imply (in actual exercise) a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling. Compare Loft, Inc. v. Guth, 23 Del.Ch. 138, 2 A.2d 225 (1938).

■ Little is to be gained by summarizing the evidence. It persuades me that, while plaintiff proved that Centex and Heftler each had nominees on the L. & N. board, he did not prove that either or both corporations, singly or in combination with others, dominated or controlled L. & N. in the transactions here under review. On the contrary, I find as a fact that L. & N. exercised independence of judgment and action in agreeing to the terms of the Centex-L. & N. "divorce" from Heftler, and in implementing that agreement during the settlement in San Juan. In short, I conclude that neither Centex nor Heftler dominated or controlled L. & N. with respect to the exchange of Bayamon for Carolina or in the sale to Centex.

■ Citing Sheppard v. Carey, Del.Ch., 254 A.2d 260 (1969), plaintiff argues that as joint venturers, Centex and Heftler were in a fiduciary relationship with L. & N. So they were in dealing with each other in the conduct of the enterprise. Here, however, they negotiated about their respective interests in the ventures and they did so at arms length, with the benefit of independent counsel, and in the knowledge of who they were and what they were doing. In such a circumstance, I do not find that a fiduciary duty existed as to the exchange of interests and, if it did, there was no violation of such duty by either corporate defendant to L. & N.

To this point I have determined that there is no liability upon either Centex or Heftler flowing from joint or several domination of L. & N. After the settlement Centex remained in a "contract" or other association with L. & N. as to Carolina and that relationship must be examined. But Heftler was on the other side of the exchange and, for purposes of this action, its relationship with L. & N. ended with the exchange. Accordingly, there is no need for any further discussion of its liability. In short, I find none.

### (2)

I turn now to L. & N.'s relationship with Centex both as to the exchange of Bayamon for Carolina and the transfer of its interest by L. & N. to Centex. Before discussing the specifics, several general observations may be helpful in putting this into context.

First, I regard the testimony of Jess Hay, President of L. & N., as accurately describing that company's view of the Bayamon-Carolina exchange.[4] L. & N. saw its

---

4. Mr. Hay testified:

"Q How in your mind did you approve Lomas & Nettleton receiving anything less than ⅓ of the entire consideration paid for the surrender of Centex' and Lomas & Nettleton's interests?

A Lomas & Nettleton Financial Corporation was in the transaction primarily as a lender. Its 20% participation, whether it was in the form of an equity interest or in the form of a net profits interest, was designed to provide an additional yield to it in consideration for the employment of its money beyond the stated rates of 8½, 9, and today 11%. The operators were Heftler Construction Company and Centex Construction Company. The risk takers were Heftler Construction Company and Centex Construction Company and the Murchison Brothers.

The risk takers in this transaction did not include, in our opinion, Lomas & Nettleton Financial Corporation. As between the operators, they were free to exchange their management roles between themselves. Had they wanted to they

position as an over-committed lender, it wanted the loans paid in substantial part, it wanted a better return on the moneys it had loaned, it concluded that alignment with Centex would provide the best chance for liquidation and profit.

Second, the contemporary documentation of some events was inadequate and/or in some instances the documents suggest a conclusion different from that to which the witnesses (of both L. & N. and Centex) testified.

Third, L. & N. decided to "cooperate" with Centex in giving the transfer by it to Centex a deductible label for tax purposes. Much of the difficulty in the case comes from efforts to tidy up the consequences which flowed from that decision.

(3)

Simply put, the key issue in the case is whether L. & N. disposed of its equity interest in Bayamon for no consideration and its interest in Carolina for an inadequate consideration. Defendants argue that the business judgment rule is applicable and, by its standards, the transfers are entirely blameless.

The parties divide on how the L. & N.-Centex transactions should be analyzed. Plaintiff argues that they were separate— L. & N. surrendered its Bayamon interest in October 1965 and Carolina in the following spring—and the conduct should be tested accordingly. Defendants say it was all part of a whole under a deal made in July or August 1965 by which L. & N. agreed to the trade and gave Centex an option to buy it out for $750,000.

could have freely left us with a 20% interest in Bayamon and a 20% interest in Salinas and Sabana. And on the other hand, Centex, had it elected to do that, and had it had Heftler's sanction, could have exchanged its 40% interest in Bayamon for an additional 40%.

Q  But—

A  Now wait just a minute; let me finish. Forty percent added to 40% is 80%. Now, viewing our 20% interest

In Warshaw v. Calhoun, 43 Del.Ch. 148, 221 A.2d 487, 492, 493 (1966) the Supreme Court defined the business judgment rule as follows:

"In the absence of a showing of bad faith on the part of the directors or of a gross abuse of discretion the business judgment of the directors will not be interfered with by the courts. Moskowitz v. Bantrell, 41 Del.Ch. 177, 178, 190 A.2d 749. The burden of showing the existence of bad faith or abuse of discretion rests upon the plaintiff who charges that the corporate action was taken * * *. The acts of directors are presumptively acts taken in good faith and inspired for the best interests of the corporation, and a minority stockholder who challenge[d] the *bona fides* of purpose has the burden of proof. Porges v. Vadsco Sales Corp., 27 Del. Ch. 127, 32 A.2d 148."

Application of the rule of necessity depends upon a showing that informed directors did, in fact, make a business judgment authorizing the transaction under review. And, as plaintiff argues, the difficulty here is that evidence does not show that this was done. There were director-committee-officer references to the realignment but none of these, singly or cumulatively, show that director judgment was brought to bear with specificity on the transactions. However, the decision of executive officers may also come within the Rule, Kelly v. Bell, Del.Ch., 254 A.2d 62, aff'd 266 A.2d 878 (1970). It probably does here, in the absence of any divided loyalty and in the light of subsequent ratification by the board of directors. But

in Bayamon as against our 20% interest in Salinas and Sabana, and as against a project managed and run by Centex on the one hand, or managed and run by Heftler Construction Company on the other hand, it was my decision then, as a director in 1965, the earlier part—later as president of the company—that the 5% interest in Salinas and Sabana was more valuable, more valuable than the 20% interest in Bayamon."

in view of the state of affairs and the conflicts in the record, I prefer to base my conclusions on findings from the record, and not on the broad cutting edge of the Rule. Under the special facts of this case. I think plaintiff is entitled to a finding.

### (4)

L. & N. went to San Juan with a 20% equity in Carolina and a 20% equity in Bayamon. It came away without either of these.

Given the state of the documentation, it is difficult to arrive at the precise sequence of events. But I find that L. & N., in line with the objectives to which Mr. Hay testified, agreed to exchange its 20% equity in Bayamon for a 25% equity in Carolina. And then, when the advantage to Centex in having 100% of the equity became clarified, L. & N. agreed to exchange its 25% equity for a 25% net profits agreement. All of the key witnesses testified that was the agreement before San Juan and there is at least fragmentary documentation to support it. I also accept as fact the explanation as to why the net profits agreement was not prepared as a part of the settlement, i. e., there was not time to complete it in Puerto Rico.

To this point, then, I find that, (a) at the settlement Centex acquired a 100% equity interest in Carolina and, (b) it obligated itself to give L. & N. a 25% net profits participation in Carolina and, (c) L. & N. agreed to accept such participation and, (d) an agreement as to this was to be prepared by counsel for the parties after the settlement. Accordingly, I conclude that there was consideration to L. & N. for surrender of its interest in Bayamon.[5]

### (5)

Counsel undertook preparation of the profit participation agreement but it never reached final form (at least it was never executed) because L. & N. sold its interest to Centex. And here the facts get muddled indeed. The sale was made under an agreement which states in part:

"2. We [Centex] will pay to you [L. & N.] the sum of $797,500 as a fee for your agreement to renew and extend the L & N Debt, $750,000 being payable in cash on or before June 28, 1966, $23,-750 being payable in cash on or before November 15, 1966, and $23,750 being payable in cash on or before March 15, 1967."

The agreement is dated January 3, 1966 but all defendants concede that it was not actually prepared until after March 1 and was probably executed in April or May 1966. It was deliberately pre-dated. And, more important, defendants' witnesses testified that the $797,500 was not a "fee" for extending the debt.

■ First, plaintiff argues that any such evidence violates the parol evidence rule and is not admissible. At trial I ruled the evidence admissible and I adhere to that view. I do so because, considering the testimony as to the market rate or fee for extension of a loan (1%) and the amount of the debt here involved ($5,800,-000), there is a serious question about the meaning of the document on its face: at 1% $797,500 would be the extension rate for a loan of $79,750,000. In this sense, at least, the evidence was admissible to explain or resolve the ambiguity. Turek v. Tull, 37 Del.Ch. 190, 139 A.2d 368 (1958), aff'd 38 Del.Ch. 182, 147 A.2d 658 (1958); 30 Am.Jur.2d, Evidence § 1069.

---

5. It should be recorded here that executive committee minutes, proxy solicitation material and an answer to an interrogatory all suggest that L. & N. assigned its interest in Bayamon in consideration for being relieved for losses incurred by that venture and/or payment of debts due it. There was no reference in any of these to an exchange of or sale of equity or a net profits agreement for $750,000. Given the widespread use of the $797,500 "fee" figure in L. & N.'s tax returns and annual statements, plaintiff may have performed a valuable service in helping to correct the corporate record.

Second, with the testimony of the witnesses now available, I must consider what the payment of $797,500 was for. Witnesses called by Centex and L. & N. testified in detail as to this. And they all testified to the same effect: $750,000 was for L. & N.'s "equity," that is the 25% net profits agreement, and $47,500 was the 1% fee (on the $4,750,000 balance due on the loan). The witnesses were knowledgeable and I accept their explanations. I do so as a matter of judgment on their credibility and because there is a reasonable explanation of why the "fee" label was used in the letter.[6]

Booking the $750,000 as fee was important to Centex for tax reasons while it made no difference to L. & N. L. & N. consulted its tax advisors as to the impact of that designation on its own return and, when it appeared that there was none, it agreed to the language. As I have said, much of the difficulty followed from that decision. But, I do not find it to have damaged L. & N. so significantly or to have been so reprehensible that defendants should be estopped from testifying as they did or from arguing the merits of the matter.

In short, on this issue I find that $750,000 paid by Centex to L. & N. pursuant to the agreement dated January 3, 1966 was consideration for L. & N.'s surrender of its 25% profit participation in Carolina.

(6)

I turn now to plaintiff's contention that $750,000 was inadequate consideration for the transfer to Centex of the L. & N. interest in Carolina. Defendants argue that the price was fair.

On this point I note that they rely on a price for "equity", apparently fixed in the summer of 1965, which was actually paid a year later, under an agreement dated January 3, 1966 but prepared in March, for what was said therein to be a "fee" but which is described in the evidence as the purchase price for the "25% net profits agreement." In a challenge by a stockholder that consideration should be required to stand on its merits.

I am satisfied that, given the difficulties which abounded in actual development by early 1965, L. & N. had a real and legitimate interest in seeking to reduce its exposure and withdraw its equity so that it would be invested in a matter more directly compatible with its business. And so, as defendants argue, the challenge was to obtain a fair price for the equity.

In testing what was done, I am not persuaded by plaintiff's argument based on the offer made by Heftler to Centex in February 1965 ($2,000,000 for a 40% interest). It was never consummated which, at least, indicates a want of confidence by third parties in financing it.[7] It is more reflective of hope than reality.

Defendants contend that the sale price was actually fixed in the summer of 1965 and they point to the state of affairs at that time as determinative on the question. And they argue that neither L. & N. nor Centex attributed value to Bayamon in the summer and fall of 1965, when the divorce was taking place.

It is arguable that $750,000 was inadequate for L. & N.'s interest in Carolina, particularly when the division of the 40% which came from Heftler is considered (35% to Centex, 5% to L. & N.). But, given the circumstance which obtained in the summer of 1965, I cannot say as a matter of law that it was unfair or inadequate. The time is significant. Price was

6. Mr. Hay testified:
   "There was never any question that $750,000 of the $797,500 was in payment of or for the release of L. & N.'s equity interest. The $47,500 additional was 1% of the $4,750,000 which was to be

   extended to July 15, 1967, according to the letter of January 3."

7. The offer to Centex also required that Murchison Brothers remain on the credit to Bayamon to the extent of $5,000,000.

agreed upon between L. & N. and Centex as part of the realignment plan which was thereafter implemented in October and during the following spring. And at that time L. & N. wanted out. It had offered to sell for less than $750,000 to one of the two natural buyers, Heftler, which had been unable to buy. L. & N. made new projections as to Carolina and decided that chances of an immediate payoff were small. They showed that the projects could not be completed for some three years and that its return could be less than $750,000. The price was $175,000 more than the cash offer from the other coventurer (which was unable to perform), payment would permit immediate capitalization of what was only a right to profit participation (if any). And the testimony is undisputed that the $750,000 figure originated with L. & N., not Centex.

Viewed as a whole, which I think the Court in fairness must do, I find the $750,-000 paid by Centex for L. & N.'s interest in Carolina to be adequate as a matter of law.[8]

### (7)

I turn now to the Trust. This was established on August 12, 1963 and held title to tracts of land identified as Bayamon Trust Tract, Machicote (or, Heftler Trust) Tract and others. As with the joint adventures, the equitable interests were divided 40% each to Centex and Heftler, 20% to L. & N. The Trust was terminated as part of the reorganization on October 15, 1965. Its land holdings were distributed in part for the benefit of the Bayamon Venture, the Sabana and Salinas Ventures, for Centex, and for others. The distribution to or for the benefit of Centex included the lands known as the Machicote Tract. (This was the designation used by the parties and it apparently included more than just Machicote.)

Plaintiff argues that L. & N. gave up its equity interest in Machicote in consideration for a 20% profit participation. While that profit participation was not documented, plaintiff says it must be assumed that it gave L. & N. the same right as it would have had with a 20% equity position. For present purposes, I agree.

In March 1966 Centex negotiated a sale of Machicote to a company owned and controlled by the Pritzker family for $630,000. Plaintiff argues that L. & N. should have received 20% of those proceeds, or $126,000. It did not receive anything.

As I understand defendants' argument, they make two points: first, the agreement of January 3, 1966 terminated L. & N.'s entire interest in Puerto Rico, including Machicote and, therefore, L. & N. is not entitled to share in the proceeds of sale, and (2) in any event, the proceeds were a return of capital to Centex and therefore not a profit in which L. & N. is entitled to participate.

First, as to the agreement of January 3, it says nothing about the Trust or the properties held by it. The acquisition by Centex was of "all of the assets and properties of the Joint Adventures", i. e., Sabana and Salinas. Adding Machicote to that language would reform the agreement, not construe it. If the parties had intended to include all of L. & N.'s Puerto Rican interests they certainly had adequate opportunity to do so in this document (which was not executed until April or May 1966). Second, the memorandum of July 30, 1965, prepared by L. & N.'s president, which is basic in defendants' argument about one option—one transaction, states that "We will give to Centex an option on our 25% position in Carolina." Nothing was said about the Trust, which was a separate entity holding legal title to its own properties. Third, in any event, the sale to the Pritzkers

---

8. The record abounds with testimony and documentation as to Centex's greater exposure as the risk taker in and operator of Carolina. It was in a "different" position vis-a-vis L & N.

was in fact negotiated before the January 3 agreement was prepared and at the time of negotiation, L. & N. was entitled to a 20% profit participation; if that was not recognized by the agreement of January 3, then the consideration was inadequate to that extent.

I conclude that L. & N. is entitled to a proportionate share, 20%, of the net profits received by Centex from the sale of the Machicote property to the Pritzkers.

I turn now to defendants' argument that the proceeds were not profit but a "return of capital to the joint ventures". In support of this argument they cite the testimony of Mr. Hay, but he testified that he did not know if the money was a profit or a return of capital. And the testimony of Mr. Crossen (president of Centex) on the point is so thin that it is not persuasive.[9] Nor does the testimony of Mr. Seegers (executive vice president of Centex) add substance to the matter. He simply said that the $600,000 "represented the cost to the joint ventures".

I conclude that L. & N. should have received 20% of the $630,000 which Centex received from the Pritzkers.

### C.

Finally, I turn to plaintiff's second cause of action based upon L. & N.'s obligation to develop land in Richardson, Texas.

On December 8, 1960 L. & N. sold to Centex and Heftler 234 acres of land in Richardson. The agreement obligated L. & N. to develop the acreage into 832 residential lots. By June 30, 1962 L. & N. had developed 201 lots at a cost of $205,375. In August 1963 Centex and Heftler sold the remaining undeveloped land to Canyon Creek, Inc., which transferred it to a wholly-owned subsidiary, Canyon Creek Land Corp. Thereafter L. & N. developed an additional 99 lots.

In March 1966 Canyon Creek, the title holder, was owned equally by L. & N. and Centex. At that time it was decided that L. & N. should compromise its obligation to develop the remaining 532 lots by paying $542,148 to Canyon Land. Plaintiff contends that the compromise price was excessive because it included as a factor the cost of street paving. He says that L. & N. overpaid because it was not obliged to pave and the overpayment of $270,000 should be refunded to the corporation by Centex, the indirect beneficiary.

The agreement under which L. & N. was obliged to develop the land provides as follows:

"Seller at its sole cost and expense shall fully develop the Property as residential lots according to the Approved Plat, ready for reception of building operations in compliance with subdivision requirements of the Federal Housing Administration, Veterans Administration and the City of Richardson, Texas; provided, however, that Seller's obligation with respect to grading of the lots shall be limited to rough grading, including the spreading thereon in an even and workmanlike manner of any excess dirt from excavation for streets and utilities. Seller, its agents, employees and contractors, shall have authority to enter upon the Property at all times for the purpose of enabling Seller to comply with its obligations hereunder."

L. & N.'s obligation was to "fully develop the Property as residential lots according to the Approved Plat." And that, quite

---

9. The substance of Mr. Crossen's testimony on this point is this:

"Q There has been some reference in the course of the trial to that $600,000 as profits. Do you agree with that reference?
A No.
Q That was the $600,000?
A It was a return of costs.
Q Cost incurred by whom?
A By the joint venturers.
Q Was it not costs incurred by Centex?
A Well, when Centex took over the joint ventures, of course it assumed all the costs."

clearly, was to be done in compliance with subdivision requirements of the F.H.A. And among such requirements are those relating to construction of curbs, gutters, street pavements and sidewalks. The City of Richardson required paved streets and alleys for residential development. All L. & N. personnel who testified confirmed that their understanding of L. & N.'s obligation was to that effect. And the Corporation's own contemporary understanding of the contract appears in an amendment to a registration statement filed with the S.E.C. on October 11, 1962. It specifically states that development of the lots "will involve the installation at the expense of the company of streets, storm and sanitary sewers, utilities and alleys * * *."

My reading of the contract, in light of the testimony and the related documentation, persuades me that L. & N. was obliged to provide streets and, accordingly, the payment which it made was not excessive.

Order on notice.

## On Motion for Reargument

Centex moved for reargument of that part of the opinion which holds that L. & N. is entitled to 20% of the approximately $630,000 which Centex received from the Pritzkers. After plaintiff answered, the motion was granted, the parties filed memoranda and then argued their contentions.

Centex says, first, that the Court should reform the option agreement dated January 3, 1966 because it is the result of a mutual mistake or scrivener's error.

When a written instrument fails to express the real intention of the parties, because of a mutual mistake as to the real meaning of the language used, a court of equity will reform that instrument, although there is no misunderstanding as to what words were actually inserted therein. Colvocoresses v. W. S. Wasserman Co., 24 Del.Ch. 53, 4 A.2d 800 (1939). Reformation of an instrument will be ordered upon proof of a clear understanding with which the formal document conflicts, but that proof must be shown by clear and convincing evidence which is free from doubt. Hob Tea Room v. Miller, 33 Del.Ch. 38, 89 A.2d 851 (1952); Colvocoresses v. W. S. Wasserman Co., 22 Del.Ch. 371, 2 A.2d 296 (1938). And the party seeking reformation must prove such mutual mistake by that test, that is, clearly, convincingly and beyond doubt.

Witnesses testified that the real intention of the parties was to have L. & N. transfer all of its interests in Puerto Rico, including the trust lands in question, to Centex for $750,000. That testimony conflicts with the contemporary documentation; in short, the documents are consistent with the agreement, not with the testimony. Thus the memorandum of July 30, 1965 states: "We will give to Centex an option on our [L. & N.'s] 25% position in Carolina * * *;" the trust properties are not mentioned. And the memorandum of the August 6, 1965 meeting is to the same effect. But the contemporary documentation also shows that L. & N. was aware of its interest in the trust lands and did refer to it independent of Carolina; see, for example, the minutes of the Board meeting on December 29, 1965 ("* * * among the assets of the Company are its 20% net profits interest in and to the so-called Trust Lands in Puerto Rico and its interest in the Sabana Joint Adventure and the Salinas Joint Adventure."). And so did Centex; see its letter of January 14, 1966 to Heftler.

While I have accepted generally the testimony of the witnesses, given the documentation and the doubt it creates, I cannot find that a clear understanding (with which the formal contract conflicts) was shown by clear and convincing evidence which is free from doubt. Hob Tea Room v. Miller, supra. It follows that reformation may not be ordered.

I turn now to the sale of the trust lands. Centex argues that L. & N.'s profit

participation did not include the lands sold because its participation was similar to an arrangement with Heftler which excluded the lands sold to the Pritzkers for cash. In any event, says Centex, the purchase money was a return of capital and not a profit.

Before the transfer of interests, L. & N.'s 20% equity covered all of the trust lands. If, therefore, L. & N. had retained that interest, it would have been entitled to receive 20% of the $630,000 payment. As stated in the main body of this opinion, I assume (as Mr. Hay testified) that the participation "agreement," which was never documented, was equivalent to L. & N.'s equity interest. Centex says, however, that profit participation was recognized but not in the tract sold. It argues that L. & N.'s participation was similar to that given Heftler under an agreement dated January 14, 1966 wherein trust lands are defined as "being exclusive of the sewer plant site of approximately 26 acres and approximately 82 acres around the sewer plant site, and exclusive of the Obispo tract." This excluded property was sold for the $630,000 and, Centex says, L. & N. had no interest in it nor any right to participate in any profit from the sale.

Admittedly, it is difficult to sort out much of this, particularly when the argument is based on an agreement never committed to writing which is said to be identical to an agreement which was committed to writing but which was with another party (Heftler). My view of the issue, however, is somewhat different from that argued by Centex. Assuming (as Centex contends) that the record will not support a finding that plaintiff proved the $630,000 to be profit, I conclude that he is entitled to prevail in any event because the consideration for transfer of L. & N.'s interest was inadequate. Specifically, L. & N. gave up a 20% equity position in *all* of the trust lands for a 20% profit participation in a *part* of them burdened with a $2.8M mortgage—and this was done at a time when it was known that the part burdened with the mortgage would be surrendered to the mortgage holder and at a time when the deal with the Pritzkers had been made by Centex for the $630,000. Inadequacy is measured by the difference in value of the interests: in short, L. & N. would have been entitled to 20% of the $630,000 had it retained its equity and the consideration is, in any event, inadequate to that extent.

Order on notice.