IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JEFFERY J. SHELDON and ANDRAS KONYA, M.D., PH.D., | § § § | |
| Plaintiffs-Below, Appellants, | § § § | No. 81, 2019 |
| v. | § § § | Court Below:  Court of Chancery of the State of Delaware |
| PINTO TECHNOLOGY VENTURES, L.P., PINTO TV ANNEX FUND, L.P., PTV SCIENCES II, L.P., RIVERVEST VENTURE FUND I, L.P., RIVERVEST VENTURE FUND II, L.P., RIVERVEST VENTURE FUND II (OHIO), L.P., BAY CITY CAPTIAL FUND IV, L.P., BAY CITY CAPITAL FUND IV CO-INVESTMENT FUND, L.P., REESE TERRY and CRAIG WALKER, M.D., | § § § § § § § § § § § § § | C.A. No. 2017-0838-MTZ |
| Defendants-Below, Appellees. | § § | |

Submitted:  September 11, 2019
Decided:    October 4, 2019

Before **VALIHURA**, **SEITZ**, and **TRAYNOR**, Justices.

Upon appeal from the Court of Chancery of the State of Delaware: **AFFIRMED**

Thad J. Bracegirdle, Esquire (*argued*), Scott B. Czerwonka, Esquire, Wilks, Lukoff & Bracegirdle, LLC, Wilmington, Delaware, for Appellants Jeffery J. Sheldon and Andras Konya, M.D., Ph.D.

Bruce E. Jameson, Esquire (*argued*), Samuel L. Closic, Esquire, Prickett, Jones & Elliott, P.A., Wilmington, Delaware.  Of Counsel:  B. Russell Horton, Esquire, Gary L. Lewis, Esquire, George Brothers Kincaid & Horton LLP, Austin, Texas, for Appellees Pinto Technology Ventures, L.P., Pinto TV Annex Fund, L.P., PTV Sciences II, L.P., Rivervest Venture Fund I, L.P., Rivervest Venture Fund II, L.P., Rivervest Venture Fund II (Ohio), L.P., Bay City Capital Fund IV, L.P., and Bay City Capital Fund IV Co-Investment Fund, L.P.

Brian C. Ralston, Esquire, Jacqueline A. Rogers, Esquire, Potter Anderson Corroon LLP, Wilmington, Delaware.  Of Counsel:  Danny David, Esquire (*argued*), Rebeca Huddle, Esquire, Baker Botts L.L.P., Houston, Texas,  for Appellees Resse Terry and Craig Walker, M.D.

**VALIHURA**, Justice:

Appellants Jeffrey J. Sheldon and Andras Konya, M.D., Ph.D., alleged in the Court of Chancery that several venture capital firms and certain directors of IDEV Technologies, Inc. ("IDEV") violated their fiduciary duties by diluting the Appellants' economic and voting interests in IDEV. The Appellants argued that their dilution claims are both derivative and direct under *Gentile v. Rosette*[1] because the venture capital firms constituted a "control group." The Court of Chancery rejected that argument and held that the Appellants' dilution claims were solely derivative.[2] Because the Appellants did not make a demand on the IDEV board or plead demand futility, and because the Appellants lost standing to pursue a derivative suit after Abbott Laboratories purchased IDEV and acquired the Appellants' shares, the court dismissed their complaint. On appeal, the Appellants raise a single issue: They contend only that, contrary to the Court of Chancery's holding, they adequately pleaded that a control group existed, rendering their claims partially "direct" under *Gentile*. Therefore, according to the Appellants, their complaint should not have been dismissed. We agree with the Court of Chancery's determination that the Appellants failed to adequately allege that the venture capital firms functioned as a control group. Accordingly, we affirm the dismissal of the complaint with prejudice.

## I. Background

IDEV, a Delaware corporation based in Texas, develops and manufactures devices used in interventional radiology, vascular surgery, and interventional cardiology. Sheldon

---

[1] 906 A.2d 91 (Del. 2006).

[2] *See Sheldon v. Pinto Tech. Ventures, L.P.*, 2019 WL 336985, at *1 (Del. Ch. Jan. 25, 2019) [hereinafter *Opinion*].

3

founded IDEV in 1999 and served as its Chief Executive Officer from its founding until 2008. Konya invented certain devices licensed by IDEV and served as a consultant to IDEV between 2000 and late 2012.

Between 2004 and 2008, IDEV completed three rounds of financing through which three venture capital firms (the "Venture Capital Firms")[3] acquired a substantial proportion of IDEV's outstanding shares. In 2009, IDEV went through a management change, restructured its sales force, and implemented a new strategic plan focused on leveraging and developing its core technologies. It also determined that to support its future growth, IDEV needed to raise additional equity capital.

By early 2010, Sheldon owned 1,250,000 shares of common stock and 45,998 shares of Series B Preferred Stock—comprising 2.5% of IDEV's total outstanding shares— and Konya owned 650,000 shares of common stock, a 1.25% ownership stake in IDEV. The Venture Capital Firms held over sixty percent of IDEV's outstanding shares. Sheldon, Konya, the Venture Capital Firms, and the other Shareholders[4] were bound by the Fourth Amended and Restated Shareholders Agreement (the "Shareholders Agreement"), which, in relevant part, governed the election of several IDEV directors and provided certain

---

[3] The Venture Capital Firms consisted of eight Delaware entities that can be divided into three groups—the "Pinto" entities (Pinto Technology Ventures, L.P. and subsidiary partnerships Pinto TV Annex Fund, L.P. and PTV Sciences II, L.P.); the "RiverVest" entities (RiverVest Venture Fund I, L.P., RiverVest Venture Fund II, L.P., and RiverVest Venture Fund II (Ohio), L.P.); and the "Bay City" entities (Bay City Capital Fund IV, L.P. and Bay City Capital Fund IV Co-Investment Fund, L.P.).

[4] The Shareholders Agreement defines "Shareholders" as "the Key Shareholders and the Significant Shareholders, and their respective heirs, legal representatives, administrators and successors." App. to Opening Br. at A257. We use the term as defined therein.

4

Shareholders, including Sheldon, with preemptive rights.[5]  Listed in the Shareholders Agreement were twenty "Key Shareholders" and seventy "Significant Shareholders." Sheldon was both a Key and Significant Shareholder, and Konya was a Key Shareholder only.

Section 7 of the Shareholders Agreement was titled "Voting Agreement."  Section 7(a), the director election provision, provided that:  "each Shareholder will vote all of the Shareholder's Restricted Shares and take all other necessary or desirable actions" to cause the election of "[o]ne individual designated by Pinto TV Annex Fund, L.P.," "[o]ne individual designated by RiverVest Venture Fund II, L.P.," and "[o]ne individual designated by Bay City Capital Fund IV, L.P."[6]  The Shareholders also agreed to elect to the board IDEV's Chief Executive Officer, as well as "[t]wo individuals designated by a majority of the PTV Designee, the RiverVest Designee and the Bay City Designee, which individuals shall initially be Reese S. Terry and Craig Walker, M.D." (together with the Venture Capital Firms, the "Defendants").[7]  Aside from the director election and corresponding removal obligations, and as otherwise limited by IDEV's governing documents, each Shareholder "retain[ed] at all times the right to vote the Shareholder's

[5] *See id.* at A263–64 (Shareholders Agreement § 6 (governing preemptive rights)), A264–65 (Shareholders Agreement § 7(a) (director election provision)).

[6] *Id.* at A265 (Shareholders Agreement § 7(a)(i)–(iii)).

[7] *Id.* at A265 (Shareholders Agreement § 7(a)(iv)–(v)).  The complaint alleged there were six directors on the IDEV board.  The Court of Chancery observed, however, that a subsequent brief indicated that there were seven directors.  The court assumed that there were seven directors, noting that the Defendants seemed to agree that there were seven. *Opinion*, 2019 WL 336985, at *12 n.143.  Because the parties do not contest this on appeal, we likewise assume the IDEV board consisted of seven directors.

5

Restricted Shares in its sole discretion on all matters presented to the Corporation's Shareholders for a vote . . . ."[8]

In July 2010, IDEV implemented a new financing effort to bring in over $40 million of new capital (the "Financing"). The Financing consisted of two steps. Step one was to set the stage for raising the capital. The Venture Capital Firms first voted to convert IDEV's preferred stock to common stock. The Venture Capital Firms then, by written consent, amended IDEV's Certificate of Incorporation with the objective of (1) effecting a reverse stock split of common stock, converting every one-hundred shares into a single share, and (2) authorizing and issuing a new class of Series B-1 Preferred Stock. Finally, the Shareholders Agreement, which could be amended by a sixty percent vote, was amended by IDEV and the Venture Capital Firms to eliminate certain preemptive rights of the Significant Shareholders, including Sheldon.

After implementing these changes, the Venture Capital Firms began the second step in the Financing. In an initial closing, IDEV raised $27 million by selling the newly authorized Series B-1 shares to new and existing investors. The company also instituted an exchange and purchase offering, which allowed previous holders of preferred stock to convert their common shares into Series A-2 Preferred Stock, so long as they also purchased Series B-1 Preferred Stock. The circulated Confidential Information Statement warned that the Financing would "result in substantial dilution to Common Stockholders,

---

[8] *Id.* at A266 (Shareholders Agreement § 7(c)).

and the dilution will be significantly increased as to Common Stockholders that do not participate . . . ."[9] Nevertheless, neither Sheldon nor Konya participated in the Financing.[10]

The Financing had an ancillary effect on certain promissory notes held by IDEV. The company held about $1.7 million of full-recourse promissory notes issued by certain of its employees to finance their purchases of IDEV common stock. The notes, which were secured by the purchased shares, became "substantially undersecured" as a result of the decrease in common stock value caused by the Financing. In November 2011, IDEV cancelled the notes, took back the purchased shares, and issued special bonuses to those employees.

In 2013, roughly three years after the Financing, IDEV was acquired by Abbott Laboratories for approximately $310 million. Appellants collectively owned 0.012% of the outstanding IDEV shares at the time of sale, compared to the 3.75% they held pre-Financing. Sheldon and Konya claim that instead of the respective $15,000 and $7,500 they were actually entitled to from the Abbott acquisition, they would have received $7.75 million and $3.875 million, respectively, had their shares not been diluted in the 2010 Financing.

---

[9] App. to Opening Br. at A1592 (Confidential Information Statement).

[10] The Appellants argue in their Reply Brief on appeal that Konya was "prohibited from participating because he did not qualify under certain applicable securities laws" and that the "vast majority" of Sheldon's stock was ineligible to participate in the exchange and purchase offering. Reply Br. at 2 n.2. While this issue appears to have been disputed in the proceedings below, it was not addressed in the Court of Chancery's opinion. Nor was it properly raised as an issue in this appeal, and, thus, it does not have any impact on our decision.

The Appellants first sued the Defendants in a Texas trial court, which dismissed their complaint. The Texas Supreme Court eventually agreed with the trial court's decision (at least as to the defendants sued here) based on a forum selection clause in the Shareholders Agreement requiring any action arising from that agreement to be brought in Delaware.[11] Appellants promptly re-filed their suit in the Delaware Court of Chancery. After the Defendants moved to dismiss, Appellants amended the complaint and the Defendants renewed their motion to dismiss.

The Court of Chancery granted the Defendants' motion to dismiss on January 25, 2019. It noted that dilution claims are "classically derivative," and held that the Defendants' actions were not also "direct" claims under *Gentile* because the facts pleaded failed to show with reasonable conceivability that the Venture Capital Firms were a control group.[12] In addressing the control group issue, the court focused on two cases on opposite ends of the spectrum: *In re Hansen Medical, Inc. Stockholders Litigation*,[13] where the court held on a motion to dismiss that the plaintiffs had sufficiently pled the possible existence of a control group, and *van der Fluit v. Yates*,[14] where the plaintiff had failed to adequately plead a control group.

The Court of Chancery determined that the control group alleged in this case is more like that in *van der Fluit*, noting that while the investors in *Hansen* had a long, well-

---

[11] *See Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 433 (Tex. 2017).

[12] *Opinion*, 2019 WL 336985, at *8, *10.

[13] 2018 WL 3025525 (Del. Ch. June 18, 2018).

[14] 2017 WL 5953514 (Del. Ch. Nov. 30, 2017).

documented history of coordinated investments, the Venture Capital Firms here were more loosely connected. The court found that the Venture Capital Firms' prior connections were likely coincidental in that they invested in the same industry, not because they operated in tandem. In light of this, employing the reasonable conceivability standard of Court of Chancery Rule 12(b)(6), the court held that the Appellants' dilution claims were solely derivative. Because the Appellants had not made a demand on the board or pled demand futility, and because the Appellants lost standing to bring a derivative suit following the Abbott acquisition, the court dismissed the Appellants' claims for failure to comply with the requirements of Court of Chancery Rule 23.1. The Appellants filed their notice of appeal on February 25, 2019.

## II. Analysis

The Appellants raise only one issue on appeal: whether the Court of Chancery erred in dismissing their complaint by holding that the Venture Capital Firms were not a "control group," as alleged by the Appellants in their effort to plead a "dual-natured" claim under *Gentile*. As such, we address this sole issue.[15] We review *de novo* the question of whether it is reasonably conceivable, based on the allegations in the operative complaint, that the

---

[15] This Court raised in Oral Argument the threshold question of whether a "classically derivative" dilution claim arising from an overpayment was actually pled and whether the facts should be viewed through the *Gentile* prism. Oral Argument Video at 1:44–2:06, 21:00–22:45, https://livestream.com/accounts/5969852/events/8806638/videos/196132813. However, because those issues (including what, if any, effect the absence of an overpayment claim should have on the direct versus derivative analysis under *Tooley*) were not appealed or briefed, we decline to review them. *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004). Instead, we take the appeal as framed by the parties and consider the sole issue of whether a control group was adequately alleged.

Venture Capital Firms constituted a control group.[16]  We must accept all well-pled allegations as true and draw reasonable inferences in favor of the Appellants.[17]  We need not accept conclusory allegations as true, nor should inferences be drawn unless they are truly reasonable.[18]

The traditional rule is that dilution claims are "classically derivative."[19]  But in *Gentile*, we recognized that dilution claims can be both derivative and direct in character when:

> (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.[20]

"[A] stockholder could be found a controller under Delaware law: where the stockholder (1) owns more than 50% of the voting power of a corporation or (2) owns less

---

[16] *See Feldman v. Cutaia*, 951 A.2d 727, 730 (Del. 2008) (reviewing *de novo* the Court of Chancery's decision to grant the motion to dismiss under Court of Chancery Rule 12(b)(6)); *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 897 (Del. 2002) ("[D]ismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'" (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del.1982))).

[17] *Feldman*, 951 A.2d at 731.

[18] *Id.*

[19] *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1251 (Del. 2016).

[20] *Gentile*, 906 A.2d at 99–100.  As this Court more recently recognized in *El Paso*, "some recent case law can be read as undercutting the traditional rule that dilution claims are classically derivative." 152 A.3d at 1251.  We cited *Gentile* as the principal focus of that comment.  *Gentile* concerned a controlling shareholder and transactions that resulted in an improper transfer of both economic value *and* voting power from the minority stockholders to the controlling stockholders. In *El Paso*, we "decline[d] the invitation to further expand the universe of claims that can be asserted 'dually' to hold here that the extraction of solely economic value from the minority by a controlling stockholder constitutes direct injury." *Id.* at 1264.

10

than 50% of the voting power of the corporation but '*exercises control* over the business affairs of the corporation.'"[21] Relevant here, our law recognizes that multiple stockholders together can constitute a control group exercising majority or effective control, with each member subject to the fiduciary duties of a controller.[22] To demonstrate that a group of stockholders exercises "control" collectively, the Appellants must establish that they are "'connected in some legally significant way'—such as 'by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal.'"[23] To show a "legally significant" connection, the Appellants must allege that there was more than a "mere concurrence of self-interest among certain stockholders."[24] Rather, "there must be some indication of an actual agreement," although it need not be formal or written.[25] We

---

[21] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) (citing *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994)), *aff'd sub. nom., Corwin v. KKR Fin. Hldgs. LLC* 125 A.3d 304 (Del. 2015).

[22] *See In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *15 (Del. Ch. Oct. 24, 2014) ("Under Delaware law, in appropriate circumstances, multiple stockholders together can constitute a control group, with each of its members being subject to the fiduciary duties of a controller."); *Frank v. Elgamal*, 2012 WL 1096090, at *8 (Del. Ch. Mar. 30, 2012) ("If such a control group exists, it is accorded controlling shareholder status, and its members owe fiduciary duties to the minority shareholders of the corporation.").

[23] *In re Crimson*, 2014 WL 5449419, at *15 (citing *Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009)).

[24] *Carr v. New Enter. Assocs. Inc.*, 2018 WL 1472336, at *10 (Del. Ch. Mar. 26, 2018) (citations omitted); *see also In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *10 (Del. Ch. Aug. 18, 2006) (rejecting claim that "some twenty people (directors, officers, spouses, children, and parents)" comprised a control group and noting that "there are no voting agreements between directors or family member[s]. Rather, it appears that each had the right to, and every incentive to, act in his or her own self-interest as a stockholder."); *Emerson Radio Corp. v. Int'l Jensen Inc.*, 1996 WL 483086, at *17 (Del. Ch. Aug. 20, 1996) (noting that "even a majority stockholder is entitled to vote its shares as it chooses, including to further its own financial interest").

[25] *In re Crimson*, 2014 WL 5449419, at *15.

11

agree with the Court of Chancery that the allegations in the complaint fall short of this standard.

On appeal, the Appellants contend that the facts here are analogous to those in *Hansen*. In that case, the plaintiffs alleged that two individuals and their affiliated entities (the "Controller Defendants") had a twenty-one year history of coordinating investment strategies in at least seven different companies.[26] The relationship began when the pair entered into a voting agreement and declared themselves to the U.S. Securities and Exchange Commission (the "SEC") to be a "group of stockholders."[27] When they invested in the company at issue, they were "the only participants in a private placement that made them the largest stockholders of Hansen."[28] During the early stage of the merger negotiations in *Hansen*, the purchasing entity identified the controllers as "key stockholders," which granted them exclusive permission to negotiate with the purchaser.[29] Additional agreements required all shareholders to vote in favor of the merger and granted the Controller Defendants the option to acquire stock from the purchasing company (i.e., "rollover" their stock), a benefit not shared with the minority stockholders.[30] The Court of Chancery opined that:

> Although each of these factors alone, or perhaps even less than all of these factors together, would be insufficient to allege a control group existed, all of these factors, when viewed together in light of the Controller Defendants'

---

[26] *Hansen*, 2018 WL 3025525, at *7.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

twenty-one year coordinated investing history, make it reasonably conceivable that the Controller Defendants functioned as a control group during the Merger.[31]

In *van der Fluit*, by contrast, the plaintiff alleged "a group of tech-entrepreneurs and venture capitalists that included the Company's co-founders . . . and two [venture capital firms]" comprised a control group that controlled certain board members.[32] In attempting to link the purported control group constituents in a "legally significant" way, the plaintiff pointed to an Investor Rights Agreement and a Tender and Support Agreement. In holding that the plaintiff failed to plead the existence of a control group, the Court of Chancery could not find that the agreements "evidence the presence of a control group rather than a 'concurrence of self-interest among certain stockholders.'"[33] Specifically, it observed that only certain signatories to the agreements were alleged to be control group members, and stated that venture capital entities "simply appear[ed] to be early venture capital investors selected by Plaintiff as an attempt to increase the stock ownership of the purported group."[34] The court also reasoned that the Investor Rights Agreement, to which the two venture capital firms were parties, did not relate to the challenged transaction.[35]

Here, the Court of Chancery held that the allegations in the complaint are more similar to the allegations in *van der Fluit* than in *Hansen*. In their operative complaint, the

[31] *Id.*

[32] *van der Fluit*, 2017 WL 5953514, at *6 (internal quotation marks omitted).

[33] *Id.*

[34] *Id.*

[35] *Id.*

13

Appellants alleged that the Venture Capital Firms: acquired and collectively controlled over sixty percent of IDEV's issued and outstanding shares; were parties to a voting agreement that gave them the right to appoint three directors, with those directors choosing two additional directors, and to "hand-pick[ ]" the Chief Executive Officer "giving them total effective control of the IDEV Board;" had a "long and close relationship of investing together for their mutual benefit;" and, by converting the Venture Capital Firms' preferred stock holdings to common stock, acquired sufficient ownership to amend the Certificate of Incorporation for the purpose of "unjustly diluting the economic and voting interests" of the Appellants.[36] These allegations, taken together, fail to allege with reasonable conceivability that the Venture Capital Firms were connected in a "legally significant" way, either before or during the allegedly dilutive actions.

The Voting Agreement, which bound all of IDEV's Shareholders,[37] was unrelated to the 2010 Financing and Abbott acquisition, and only governs the election of certain directors to the IDEV board. The Voting Agreement provided that PTV, RiverVest and Bay City could each appoint one director to the IDEV board. But the Venture Capital Firms' appointment of directors "does not, without more, establish actual domination or control," and "[t]o hold otherwise would have a chilling effect on transactions that depend on a particular shareholder being able to appoint representatives to an investee's board of

---

[36] App. to Opening Br. at A29–30 (Am. Compl.).

[37] The Appellants contend that the trial court erroneously concluded that the Shareholders Agreement binds all IDEV shareholders because not all shareholders were signatories to the agreement. Opening Br. at 18. The trial court did not find that all shareholders were signatories to the Shareholders Agreement—only that all Shareholders were bound by it. *Opinion*, 2019 WL 336985, at *10. We, therefore, reject this claim of error.

14

directors."[38] Here, Appellants do not even identify by name in their complaint four of the directors. The only directors they mention by name are Terry, Walker, and non-party Christopher Owens. As the trial court observed, the complaint fails to allege "whether or how the Venture Capital [Firms] control those unnamed individuals."[39] In their Opening Brief on appeal, Appellants provide the names of the remaining non-party directors, Rick Anderson, Matt Crawford, Jay Schmelter and Jeanne Cunicelli, adding only that they are "affiliated" with PTV, PTV, RiverVest, and Bay City respectively.[40] Even if these additional facts are considered, the allegation is conclusory in nature and fails to add sufficient detail to effectively plead director control.

---

[38] *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 25, 2006); *see also In re KKR*, 101 A.3d at 996 ("It is well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder."); *Frank v. Elgamal*, 2014 WL 957550, at *22 (Del. Ch. Mar. 10, 2014) ("Merely because a director is nominated and elected by a large or controlling stockholder does not mean that he is necessarily beholden to his initial sponsor."); *Blaustein v. Lord Baltimore Capital Corp.*, 2013 WL 1810956, at *18 n.114 (Del. Ch. Apr. 30, 2013) (stating that allegations that a director was appointed to the board by and has consistently voted with the alleged controller are insufficient to challenge the director's independence), *aff'd*, 84 A.3d 954 (Del. 2014); *Emerson*, 1996 WL 483086, at *20 n.18 ("If plaintiffs' argument were the law, then whenever a director is affiliated with a significant stockholder, that stockholder automatically would acquire the fiduciary obligations of the director by reason of that affiliation alone. The notion that a stockholder could become a fiduciary by attribution (analogous to the result under the tort law doctrine of *respondeat superior*) would work an unprecedented, revolutionary change in our law, and would give investors in a corporation reason for second thoughts about seeking representation on the corporation's board of directors."); *In re Sea-Land Corp. S'holders Litig.*, 1987 WL 11283, at *5 (Del. Ch. May 22, 1987) ("Even if [the alleged controlling stockholder] had caused its nominees to be elected to the Sea-Land board, . . . that fact, without more, does not establish actual domination and control." (citing *Kaplan v. Centex Corp.*, 284 A.2d 119, 123 (Del. Ch. 1971))); *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984) ("[I]t is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence.").

[39] *Opinion*, 2019 WL 336985, at *12.

[40] *See* Opening Br. at 8.

Moreover, although the Appellants contend on appeal that the Voting Agreement "contractually bound the [Venture Capital Firms] (and not the other Shareholders) to vote together and designate additional directors,"[41] it does not require them to vote "together" on any transaction and was not implicated in the approval of any of the transactions in connection with the Financing. In addition to allowing each Venture Capital Firm to appoint one director, the Voting Agreement provides that the IDEV Shareholders must elect to the board IDEV's Chief Executive Officer and "[t]wo individuals designated by a majority of the PTV Designee, the RiverVest Designee and the Bay City Designee . . . ."[42] It is a majority of the Venture Capital Firms' *director-designees*—not the firms themselves—who select two of the directors. Importantly, the Shareholders otherwise "retain[ed] at all times the right to vote [their] Restricted Shares in [their] sole discretion on all matters presented to the Corporation's Shareholders for a vote . . . ."[43] Thus, we agree with the trial court that the Voting Agreement did not bear on the Financing or bind the Venture Capital Firms beyond selecting directors.[44]

The Appellants' allegations concerning the Venture Capital Firms' prior interactions are likewise unavailing. The complaint names only four companies other than IDEV in which "two or more" of the Venture Capital Firms have invested in the same financings. In particular, Appellants allege in paragraph 25 of their Amended Complaint:

---

[41] Opening Br. at 19.

[42] App. to Opening Br. at A265 (Shareholders Agreement § 7(a)(v)).

[43] App. to Opening Br. at A266 (Shareholders Agreement § 7(c)).

[44] *Opinion*, 2019 WL 336985, at *10.

16

*Third*, the Venture Capital Defendants have had a long and close relationship of investing together for their mutual benefit. In addition to IDEV, two or more of the Venture Capital Defendants count Cameron Health among their portfolio companies and have participated in a $14 million financing with Tryon [sic] Medical, Inc., a $28.8 million financing with Accumetrics, Inc., and a $50 million financing of Calypso Medical Technologies, Inc.[45]

Appellants do not specify whether the Venture Capital Firms invested through exclusive private placements, how many or which of them participated, what rights they obtained, when they occurred, or whether they agreed to vote together on any matters. Appellants also do not identify any instance in which all three Venture Capital Firms participated in any investment. The complaint does not allege that they held themselves out as a group of investors or that they reported as such to the SEC, nor does it explain how they coordinated their allegedly "long and close relationship of investing together for their mutual benefit." Rather, as the Court of Chancery concluded, "Plaintiffs' allegations merely indicate that venture capital firms in the same sector crossed paths in a few investments."[46] Moreover,

---

[45] App. to Opening Br. at A30 (Am. Compl. ¶ 25). In support of their position that the Venture Capital Firms coordinated investments in other companies, the Appellants add in their Opening Brief an additional investment in each of two prior-named companies, and argue that representatives of two venture capital defendants occupied board seats on Tryton Medical at the same time both held director seats at IDEV. These allegations were not pled in the operative complaint. *See* Opening Br. at 20. In reviewing a motion to dismiss, a court is limited to the facts pled in or appropriately incorporated into the operative complaint; new facts or facts expanding those contained in the complaint are not considered. *See Orman v. Cullman*, 794 A.2d 5, 28 n. 59 (Del. Ch. 2002) ("Briefs relating to a motion to dismiss are not part of the record and any attempt contained within such documents to plead new facts or expand those contained in the complaint will not be considered."). We note, however, that even if we consider these additional assertions, they do not alter our ultimate holding.

[46] *Opinion*, 2019 WL 336985, at *9.

it found that, "[o]ther investors participated in [the Financing and prior financing rounds] and received the same securities, but are not alleged to be part of the control group."[47]

Based on the allegations in the operative complaint and the documents incorporated therein, the Voting Agreement bound all Shareholders and provided only for the election of certain directors. Those directors and the Shareholders were free to vote in their discretion on all other matters. Further, the complaint fails to allege facts or create a reasonable inference showing that the Venture Capital Firms had anything but a "mere concurrence of self-interest."[48] Viewing the allegations in the complaint in the aggregate, we agree with the Court of Chancery that it is not reasonably conceivable that the Venture Capital Firms functioned as a control group.[49] And because the Appellants' theory that their claims are partially direct hinges upon the existence of a control group, we cannot conclude on the record before us that the Court of Chancery's conclusion was erroneous. It follows that the Appellants' standing was extinguished in the merger.

### III. Conclusion

For the foregoing reasons, we AFFIRM the Court of Chancery's dismissal of the complaint with prejudice.

---

[47] *Id.*

[48] *Carr*, 2018 WL 1472336, at *10.

[49] Because we agree with the Court of Chancery on this point, we decline to reach the other possible justifications for dismissal raised in the Defendants' briefing. *See* Director Defendants' Answering Br. at 17–23 (arguing that the directors are covered by the exculpation provision in IDEV's Certificate of Incorporation); Venture Capital Firms' Answering Br. at 32 (arguing that the Venture Capital Firms, in absence of a control group, do not owe fiduciary duties to the Appellants). We note that no separate arguments were raised in Appellants' Opening Brief as to defendants Terry and Walker.

18